IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 29, 2020 Session

## STATE OF TENNESSEE v. RALPHEAL CAMERON COFFEY

**Appeal from the Criminal Court for Knox County**
**No. 110330   G. Scott Green, Judge**

_____

### No. E2019-01764-CCA-R3-CD

_____

The Appellant, Ralpheal Cameron Coffey, was convicted in the Knox County Criminal Court of various offenses, including four counts of possession of more than one-half gram of cocaine with intent to sell and deliver within one thousand feet of a school, Class A and B felonies, and two counts of vehicular homicide, Class C felonies.  After a sentencing hearing, the trial court merged some of the convictions and ordered that the Appellant serve an effective forty-eight-year sentence in confinement.  On appeal, the Appellant contends that the evidence is insufficient to support some of the convictions, that the trial court erred by admitting the cocaine into evidence because there was a "break" in the chain of custody, and that his effective forty-eight-year sentence is excessive.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gregory P. Isaacs and J. Franklin Ammons (on appeal) and Russell T. Greene (at trial), Knoxville, Tennessee, for the appellant, Ralpheal Cameron Coffey.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Charme P. Allen, District Attorney General; and Kyle Hixson and Sean McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

This case relates to a high-speed chase involving the police and the Appellant on May 25, 2016, that started in Anderson County and ended in Knox County when the

Appellant's car crashed into a pickup truck. The truck's driver, Kevin Bradley, and the Appellant's passenger, Tommie Troupe, were killed. Bradley's passenger, Eric Kennedy, was injured.

In April 2017, the Knox County Grand Jury indicted the Appellant for driving on a suspended license in count one; felony evading arrest in counts two and three; the second degree murder of Bradley in count four; the second degree murder of Troupe in count five; the vehicular homicide of Bradley in count six; the vehicular homicide of Troupe in count seven; the aggravated assault of Kennedy in count eight; possession of more than one-half gram of cocaine with intent to sell within one thousand feet of a private secondary school in count nine; possession of more than one-half gram of cocaine with intent to deliver within one thousand feet of a private secondary school in count ten; possession of more than one-half gram of cocaine with intent to sell within one thousand feet of a daycare in count eleven; possession of more than one-half gram of cocaine with intent to deliver within one thousand feet of a daycare in count twelve; possession of a controlled substance analogue in count thirteen; and possession of marijuana in count fourteen. The Appellant went to trial in January 2019.

At trial, James Bradley testified that Kevin Bradley was the youngest of his three sons. James and Kevin's mother divorced when Kevin was about three years old, and James obtained custody of their three boys.[1] At the time of Kevin's death, he was engaged to be married and had a lawn care business. Kevin worked on May 25, 2016, and was supposed to go to Las Vegas that night with his father and brothers for a bachelor party.

Deputy Matthew Forsythe testified that he was an agent with the Eighth Judicial District Drug Task Force at the time of the Appellant's trial but that he was a K-9 officer with the Anderson County Sheriff's Office (ACSO) in May 2016. On May 25, 2016, Deputy Forsythe was attempting to serve warrants on individuals in Anderson County, including the Appellant, and was looking for a maroon Chevrolet Impala that the Appellant was known to drive. Deputy Forsythe was driving a Chevrolet Tahoe that was "striped up Anderson County Sheriff's Department, as well as K-9." The Tahoe was equipped with blue lights but did not have a dashboard camera.

Deputy Forsythe testified that another officer notified him that the Appellant was traveling in Deputy Forsyth's direction on Edgemoor Road. Deputy Forsythe proceeded to the intersection of New Anderson Road and Edgemoor and saw a maroon Impala traveling east toward him. As the Impala passed Deputy Forsythe, he saw the driver and the passenger. He described the driver as an African-American male with dreadlocks and

---

[1] When a witness shares a surname with a victim, we will refer to them by their first names for clarity. We mean no disrespect to the witness or the victim.

the passenger as "quite a bit taller" than the driver. Deputy Forsythe had a photograph of the Appellant in the Tahoe and recognized the driver as the Appellant.

Deputy Forsythe testified that the speed limit on Edgemoor Road was fifty-five miles per hour and that the Impala "probably" was traveling the speed limit. Deputy Forsythe pulled onto Edgemoor and "eased up" behind the Impala. The Appellant moved the Impala into oncoming traffic and accelerated, passing cars on the wrong side of the road. Deputy Forsythe activated his emergency equipment and notified other officers that the Appellant was "fleeing." Deputy Forsythe said that Edgemoor Road was "very busy" and that he pursued the Appellant until other officers arrived. Deputy Shawn Bannach took over as the "lead" police vehicle because the pursuit was not safe for Deputy Forsythe's K-9.

Deputy Forsythe testified that the pursuit of the Appellant "cleared" the intersection of Edgemoor Road and Clinton Highway. The pursuit traveled onto Racoon Valley Road and into Knox County. The Appellant and the officers turned onto Heiskell Road, and the officers terminated the pursuit. Five to ten minutes later, Deputy Forsythe learned about an "accident" in Knox County. He went to the scene and saw a "horrific" crash involving the Impala. He said the Appellant was sitting in the driver's seat "with his upper torso laid across Mr. Troupe, who was in the passenger seat laid completely down." Deputy Forsythe identified the Appellant in the courtroom as the driver of the Impala.

On cross-examination, Deputy Forsythe acknowledged that as the Impala approached him at the intersection of New Henderson and Edgemoor, the Impala was traveling at a "normal" speed. Deputy Forsythe wanted to identify the driver and was able to see the driver and the passenger for thirty to forty-five seconds. He said he did not recall the Impala's having tinted windows; however, if the windows were tinted, he could see through them.

Deputy Forsythe testified that police pursuits were allowed in Anderson County and that a pursuit could be canceled by a supervisor or the officer involved in the pursuit. On the day of this incident, Sergeant Wally Braden, Corporal Rick Coley, and Sergeant Robert Mansfield were Deputy Forsythe's supervisors. Defense counsel had Deputy Forsyth read aloud from the Anderson County Sheriff's Policies and Procedures, and Deputy Forsythe read as follows: "A supervisor should terminate the pursuit when further chase is pointless or presents an unreasonable danger to the members of the public. . . . Pursuits are limited to a maximum of two units." The Appellant's pursuit reached speeds of one hundred miles per hour and involved four units. On redirect examination, Deputy Forsythe testified that he would not have pursued the Appellant if the Appellant had stopped the Impala.

Corporal Rick Coley of the ACSO testified that in May 2016, he was a supervisor in Aggressive Criminal Enforcements (ACE), a warrants unit. On May 25, Corporal Coley was "sitting" at the intersection of Edgemoor Road and Clinton Highway when he heard on the police radio that a maroon Impala, which officers were trying to find, was traveling east on Edgemoor. Corporal Coley heard that Deputy Forsythe got behind the Impala and that the Impala "took off." Corporal Coley activated his emergency equipment and traveled west on Edgemoor, which was a two-lane road. As Corporal Coley was moving toward the pursuit, the Impala came into Corporal Coley's lane of traffic "head on." Corporal Coley said that he had to move onto the shoulder to avoid a collision and that the Impala "seemed to be coming so fast that the rear end of the car was coming sideways" toward the front of his police vehicle.

Corporal Coley testified that he turned around and traveled east on Edgemoor but that he was unable to catch up to the pursuit. He saw the pursuit "at a distance" when it crossed Clinton Highway. Corporal Coley's vehicle was equipped with a dashboard camera, and the State played a video recording of the incident for the jury. Corporal Coley went to the crash scene in Knox County and saw a pickup truck on its side. He said the Impala "looked like it had been wrapped around a telephone pole." To Corporal Coley's knowledge, there were no warrants for Troupe in Anderson County.

On cross-examination, Corporal Coley testified that in the video, the Impala's windows appeared to be up. However, Corporal Coley could not determine from the video if the Impala's windows were tinted.

Deputy Shawn Bannach of the ACSO testified that on May 25, 2016, he was assisting the ACE team and was parked on Edgemoor Road. Deputy Bannach was in a "marked" Crown Victoria that was equipped with blue lights but no dashboard camera. He heard that Deputy Forsythe was in pursuit of an Impala and traveling east on Edgemoor. Deputy Bannach activated his blue lights and siren and became the second police unit in the pursuit. He said the Impala was traveling at a high rate of speed and moving into the middle turn lane to pass vehicles. Deputy Forsythe requested that Deputy Bannach take over as the lead vehicle per "K-9 policy."

Deputy Bannach testified that the Impala traveled through the intersection of Edgemoor Road and Clinton Highway, onto Racoon Valley Road, and into Knox County. Racoon Valley became "curvy," and Deputy Bannach had to slow down because vehicles were on the roadway. The Appellant was driving "[e]rratically," at a high rate of speed, and passing vehicles, and Deputy Bannach lost sight of the Impala. When Deputy Bannach got to Heiskell Road, people standing outside the Heiskell Market told him that the Impala had turned right onto Heiskell. Deputy Bannach turned right and headed south on Heiskell for "a minute or less." He did not see the Impala, so he discontinued the pursuit.

- 4 -

On cross-examination, Deputy Bannach testified that he could not determine if the Impala's windows were tinted. He said he did not know how many people were in the Impala.

Brandon Stooksbury testified that he and Kevin Bradley were friends and went to middle and high school together. On May 25, 2016, Stooksbury was working outside Rusty Wallace Honda at the corner of Callahan Road and Central Avenue Pike in Knox County. About 2:30 p.m., Bradley passed by the dealership and yelled out jokingly to Stooksbury, "[G]et to work boys." Bradley was driving a white Ford F-150 pickup truck with a mowing trailer and was traveling east on Callahan toward Central Avenue Pike.

Stooksbury testified that after Bradley passed the dealership, Stooksbury "heard a loud car coming through there flying" and "saw a flash of maroon." The car hit the driver's side of Bradley's truck, and the truck "flipped up in the air." Stooksbury said that he "took off running as fast as [he] could" toward the crash and that Bradley was hanging out of the driver's side window of the truck. An off-duty paramedic pulled Bradley out of the pickup and started CPR. Stooksbury said that the car that hit the truck was a maroon Impala and that the car "was doing every bit of a hundred, hundred and ten mile an hour" at the time of the crash. On cross-examination, Stooksbury testified that he did not witness the impact but that he saw the truck and trailer "flipping up into the air."

Kimberly Rosaco testified that on the afternoon of May 25, 2016, she was stopped at a red light at the intersection of Callahan Road and Central Avenue Pike. Rosaco's vehicle was in the left turn lane on Callahan so that she could drive north on Central Avenue Pike. A white pickup truck was stopped beside her. The truck's windows were down, and Rosaco heard Bradley laughing. She said, "I looked him in the eye and he looked like a very happy, you know, gentleman." When the light turned green, Rosaco pulled forward and "happen[ed] to catch out of the corner of [her] eye this little red streak." She then heard a collision "so loud that it sounded like a cannon with glass breaking in it." Rosaco said the Impala came "so close" to hitting her van that she pulled over and got out to make sure the Impala had not hit her vehicle.

Joshua Jordan testified that on May 25, 2016, he was an off-duty firefighter for the City of Knoxville and was traveling east on Callahan Road toward Central Avenue Pike. Jordan stopped at the red light at Central Avenue Pike and was the second or third car in line. Bradley's truck and trailer were in front of Jordan. When the light turned green, the line moved forward "just like normal" to go straight through the intersection. Jordan saw "a red blur" traveling south on Central Avenue Pike and saw the blur hit Bradley's truck. The two vehicles "kind of tumbl[ed] diagonally," and the truck ended up on its side with Bradley hanging out of the truck by his feet. Jordan parked his vehicle, and a police officer

- 5 -

helped him pull Bradley out of the truck. Jordan felt for a pulse but did not detect one. He started chest compressions and continued until emergency personnel arrived.

Eric Kennedy testified that he worked for Kevin Bradley and that they mowed lawns on May 25, 2016. Bradley was going to Las Vegas that night and needed to deliver a mower before he left, so he and Kennedy were on their way to Dante Road. Bradley was driving a Ford F-150, Kennedy was in the passenger seat, and they were pulling a trailer loaded with a forty-eight-inch mower and a sixty-inch mower. Two blowers and two weed eaters were in the bed of the truck. They were traveling east on Callahan Road toward Dante Road and were less than a mile from their destination.

Kennedy testified that as Bradley passed the Honda dealership on Callahan Road, Bradley yelled out to Stooksbury. Bradley stopped for the red light at the intersection with Central Avenue Pike, and a car was in front of Bradley's truck. When the light turned green, Bradley and Kennedy noticed that the car "squealed its tires as it took off through the light." Kennedy then heard "the loudest boom" he had ever heard in his life. He said he "woke up in the windshield of the truck," smelled gasoline, and panicked. The truck was on its passenger side, so Kennedy kicked out the windshield, exited the truck, and saw Bradley hanging out of the driver's side window. Kennedy said that he was in shock and that he sat with Bradley briefly. He then walked away and blocked himself from being able to see Bradley. Kennedy said he suffered only a broken tooth and scratches. On cross-examination, Kennedy testified that he did not see a red streak or red blur prior to the crash.

Officer Andy Wilson, a K-9 officer with the Knox County Sheriff's Office (KCSO), testified that on May 25, 2016, he was a KCSO patrol officer and drove a Dodge Charger with "normal markings" on it. About 2:30 p.m., Officer Wilson was leaving roll call in downtown Knoxville when he heard a be-on-the-lookout (BOLO) for the pursuit of a maroon Impala that could be entering Knox County from Anderson County. The BOLO said that the driver of the Impala was Ralpheal Coffey and that he may be armed and dangerous. Officer Wilson activated his emergency equipment and headed north on Interstate 75 toward Racoon Valley, where the Impala was last seen. Officer Wilson exited the interstate at Emory Road, turned left, and drove to the intersection of Emory Road and Heiskell Road. He described the intersection as "one of our highest traffic volume areas, especially around 2:30, 3:00 in the afternoon."

Officer Wilson testified that he headed north on Heiskell Road and that he saw the maroon Impala traveling south. Southbound traffic was "backed up," so the Impala swerved out of the southbound lane and into Officer Wilson's northbound lane. The Impala was traveling at a high rate of speed toward Officer Wilson, and Officer Wilson "slammed on [his] brakes" and closed his eyes because he thought the Impala was going to hit his patrol car "head on." Instead, the Impala swerved into a grassy area. Officer Wilson said

the Appellant "somehow managed to regain control of his vehicle" and got the Impala back into the oncoming lane of traffic on Heiskell. The Appellant drove through a red light at the Emory Road intersection and continued southbound on Heiskell, which became Central Avenue Pike. Officer Wilson turned around and followed the Appellant but lost sight of the Impala around a curve. Officer Wilson did not see the Impala again until he got to the intersection of Central Avenue Pike and Callahan Road.

Officer Wilson testified that as he approached the intersection, he looked toward Interstate 75 because he thought the Appellant may try to get on the interstate and head back toward Anderson County. Officer Wilson saw a white pickup truck on its side against a utility pole. The Impala was "on the back side of that truck also against the pole on the opposite side." An off-duty paramedic was trying to render aid to Bradley, who was hanging out of the driver's side of the truck. An officer riding with Officer Wilson also was a paramedic and tried to help Bradley, so Officer Wilson went to the Impala.

Officer Wilson testified that the Appellant and Troupe were unresponsive. Troupe's passenger seat was "all the way down," and Troupe was lying face-down in the seat. The Appellant's "butt" and legs were in the driver's seat, and the Appellant's legs were "pinned" under the steering wheel. The Appellant's upper body was lying across the center console. A few moments later, the Appellant started moving and groaning.

Officer Wilson testified that the collision was "one of the worst" he had ever worked, that both vehicles had extensive damage, and that he could not open the Impala's doors. Based on the report that the Appellant may have been armed and dangerous, Officer Wilson handcuffed the Appellant's right wrist to the frame of the passenger door. Officer Wilson said that he recovered two baggies from the Appellant's lap and that one baggie contained a green leafy material while the other baggie contained a white substance. After the Appellant was "extricated" from the Impala, $545 "all in small bills" and a driver's license were pulled out of his pocket. Officer Wilson learned the Appellant's license had been suspended. Officer Wilson was wearing a body camera on May 25, 2016, and the State played the video for the jury.

On cross-examination, Officer Wilson acknowledged that the Appellant could have hit him on Heiskell Road and that the Appellant drove off the road to avoid a collision. As the Impala passed Officer Wilson, he noticed it had tinted windows. Officer Wilson acknowledged that when he arrived at the crash scene, the Impala was "almost bent into a U" where it had collided with the utility pole. The Appellant was lying across the Impala's center console, and his upper body and Troupe's body were both in the passenger seat. Officer Wilson did not find any weapons or drug paraphernalia in the car. He said that he found a baggie of cocaine and a baggie of marijuana and that his body camera video

appeared to show that the baggies were in the "arm" of the driver's door, not the Appellant's lap.

Sergeant Timothy Belcher, a member of the KCSO's crash reconstruction team, testified that on May 25, 2016, he was dispatched to the intersection and was the team leader for the wreck. Sergeant Belcher and his team members photographed the scene, which he described as a "crime scene"; marked the ground with paint for later examination; and collected witness statements. The two vehicles were towed to a secure lot, and Sergeant Belcher obtained search warrants for the vehicles' data recorders. Based on Sergeant Belcher's investigation, he concluded that the Appellant was the "at-fault" driver.

On cross-examination, Sergeant Belcher testified that he did not see any marks on the pavement to indicate that either vehicle had decelerated prior to the crash. Sergeant Belcher inventoried the Impala and did not find any significant evidence. The Appellant was not the registered owner of the car.

Deputy Sheriff Bobby Jones of the KCSO testified as an expert in accident reconstruction that he was dispatched to the scene on May 25, 2016, and that his job was to "figure out" how the crash occurred, calculate speeds, and help determine who was at fault. Deputy Jones used the FARO 3D scanner to "scan the scene." He described the scanner as a "small box" that used a laser to capture a three-hundred-sixty-degree view of the area and to measure everything "within its sight and range." Deputy Jones then returned to his office, made measurements and calculations from the scanner, and determined how the crash occurred. He said that the FARO scanner was "the most efficient and effective way to make a crash scene" and that he used the scanner to produce a panoramic video of the scene. The State played the video for the jury.

Deputy Jones testified that after the crash, the truck came to rest on one side of a utility pole, and the Impala came to rest on the other side of the pole. The trailer was "thrown" from the truck. Based on the point of impact and scuff marks, gouge marks, and scrape marks on the road, Deputy Jones calculated the speed of the vehicles at the time of the crash. He determined that the truck was traveling twenty-three miles per hour and that the Impala was traveling sixty-eight miles per hour.

Deputy Jones testified that the Impala's data recorder, often referred to as a "black box," provided information about the vehicle before the crash. One-half second before impact, the Impala's accelerator pedal was ninety percent, meaning the pedal was "almost on the floor," and the car's speed was seventy-one miles per hour. One second before impact, the accelerator was ninety-eight percent, and the car's speed was seventy miles per hour. One and one-half seconds before impact, the accelerator was ninety-nine percent, and the vehicle's speed was sixty-eight miles per hour. Two seconds before impact, the

accelerator was one hundred percent, and the car's speed was sixty-five miles per hour. The black box showed that the car's brake "switch" never activated. Deputy Jones said that the vehicle was being "floorboarded" up until just before impact and that his calculation of the Impala's speed as sixty-eight miles per hour was within a couple of miles per hour of the black box data. Based on Officer Wilson's body camera video and the Appellant's injuries, Deputy Jones determined that the Appellant was driving the Impala. He said it would have been physically impossible for the Appellant and Troupe to have switched positions after the crash.

On cross-examination, Deputy Jones testified that the truck hit the Impala on the Impala's right front section, including the Impala's passenger door. The Appellant appeared to be steering the Impala to the left to avoid the truck. Although the Impala was traveling sixty-eight miles per hour at the time of the crash, the car's potential maximum speed was "well over" one hundred miles per hour. The Impala did not produce any skid marks prior to the crash, meaning the vehicle did not decelerate.

Officer Derrick White of the Knoxville Police Department (KPD) testified that he lived in the area of Callahan Road and Central Avenue Pike. On the afternoon of May 25, 2016, he was on his way to roll call, noticed the crash scene, and assisted KCSO officers. At some point, Officer Wilson "threw" two bags of narcotics to Officer White, and the bags landed on the hood of the Impala. Officer White donned gloves, put the bag of cocaine and the bag of marijuana into a glove, and put the glove into his back pocket. Later, Officer White pulled cash and a driver's license out of the Appellant's pocket. Before Officer White left the scene, he gave the two bags back to Officer Wilson.

Officer White testified that crack cocaine for personal use usually consisted of one crack rock, was packaged in one bag, and weighed 0.2 or 0.3 grams. Crack cocaine for sale or delivery usually was packaged in several bags and weighed one ounce or twenty-eight grams.

Alex Ridenour, an emergency medical technician (EMT) for Rural Metro, testified that he and his partner were dispatched to the crash scene on May 25, 2016. When they arrived, paramedics from another ambulance were already working on Bradley, so Ridenour went to the passenger side of the Impala. Troupe was lying face-down in the passenger seat. The Appellant was handcuffed to the passenger door, so Ridenour's partner requested that the police remove the handcuffs for treatment. Ridenour checked Troupe for a pulse. Troupe's pulse was "very faint," and he was not breathing well.

Ridenour testified that the Appellant was pulled from the Impala, strapped to a spine board, and put onto a stretcher. Ridenour and his partner transported the Appellant to the University of Tennessee (UT) Medical Center in an ambulance. The Appellant was talking

and breathing but repeatedly questioned what was happening. After the Appellant was taken into the emergency room, Ridenour was in the back of the ambulance and noticed part of a Walmart bag on the floor. He picked up the bag and felt "like a piece of gravel in it." Ridenour went into the hospital and gave the bag to a sheriff's deputy. He said that the bag looked like the corner of a Walmart bag and that the bag was "pulled very tight and twisted."

Officer Chris Stewart of the KCSO testified that on May 25, 2016, he was dispatched to UT Medical Center to meet an ambulance with two individuals who had been involved in a pursuit and a crash. When Officer Stewart arrived, the Appellant and Troupe were in the emergency room, so Officer Stewart observed the Appellant. He said that the Appellant was "very agitated" and "trying to get up" and that the Appellant was cursing at the doctors and nurses. While Officer Stewart was watching the Appellant, an EMT came into the hospital with narcotics he had found in an ambulance. The EMT put the narcotics with the Appellant's property; Officer Stewart did not take custody of the drugs.

Officer Lee Strzelecki of the KCSO testified on May 25, 2016, he went to UT Medical Center to obtain a blood sample from the Appellant, which was standard procedure for a fatal crash. While Officer Strzelecki was at the hospital, an EMT told him that the EMT had found drugs while cleaning out an ambulance. The EMT said he put the drugs in the Appellant's property bag. Officer Strzelecki found the drugs in a white plastic property bag that was at the foot of the Appellant's gurney and kept possession of the drugs until he could meet with Officer Wilson, who had retrieved drugs from the Impala. Officer Strzelecki gave the drugs from the Appellant's property bag to Officer Wilson, and Officer Wilson turned in all of the drugs to the narcotics division.

Officer Strzelecki testified that a blood sample had been obtained from the Appellant when the Appellant first arrived in the emergency room. After Officer Strzelecki arrived at the hospital, a phlebotomist tried to draw blood from the Appellant for the KCSO, but the phlebotomist could only obtain a small amount of blood due to the severity of the Appellant's injuries. Officer Strzelecki turned in that blood sample to the Tennessee Bureau of Investigation (TBI) Crime Laboratory, but the sample was too small for analysis. A couple of days later, the police obtained a search warrant for two vials of blood that were drawn from the Appellant when he first arrived at the hospital. The KCSO sent those vials to the TBI for analysis, and the Appellant's blood was negative for alcohol and drugs. On cross-examination, Officer Strzlecki acknowledged that the Appellant was in "bad shape" when the Appellant was in the emergency room.

Special Agent Sharon Norman of the TBI Crime Laboratory testified as an expert in forensic chemistry that she received three items for analysis. The first item was "a plastic corner bag that was tied." The bag contained one off-white, rock-like substance and "five

- 10 -

additional corner bags that were also tied." Each of the five corner bags contained an off-white, rock-like substance. The second item was "a piece of white plastic" that contained an off-white, rock-like substance. The third item was "a clear plastic corner bag that was tied" and contained plant material.

Agent Norman testified that for the first item, she analyzed the single rock-like substance and the rock-like substance that was in one of the corner bags. Both of the substances were cocaine base and had a total weight of 1.03 grams. Agent Norman did not analyze the rock-like substances in the other four corner bags, but the substances in the four bags had a total weight of 3.68 grams. Agent Norman's analysis of the second item revealed that it was Dibutylone, an analog of a Schedule II drug, and weighed 0.33 grams. Agent Norman's analysis of the third item revealed that it was marijuana and weighed 2.81 grams.

Donna Roach testified that she was employed by KGIS, a mapping service for Knox County. Roach generated a map showing a one-thousand-foot buffer zone around 6700 Central Avenue Pike and a one-thousand-foot buffer zone around 6828 Central Avenue Pike. The map showed that the intersection of Central Avenue Pike and Callahan Road was within both buffer zones.

Robin Lieser testified that she was the Principal of Trinity Christian Academy, which she described as "a category four church related school that caters to families who have chosen to home educate their students." She said the school was founded in 2002, enrolled students in kindergarten through twelfth grade, and provided standardized testing and kept cumulative academic records for home-schooled students. The school also had a cooperative program, and a student did not have to be enrolled in the "umbrella school to participate in the co-op." Lieser stated that the cooperative program was "predominantly parent-led where we co-op together to offer academic enrichment or practical living skill courses to meet the needs of home schooled students." The cooperative classes were held at New Covenant Fellowship, an "affiliate church" located at 6828 Central Avenue Pike, and some students remained at the facility for lunch.

On cross-examination, Leiser testified that the cooperative classes were held only one day per week from 9:00 a.m. to 3:00 p.m. She acknowledged that the school was "not like a normal school that has the summers off" and said that category four church-related schools were in session "year round" because "[a] home school parent has 365 days to do 180 days of acquired school."

Michelle Helterbridle testified that she was a program evaluator for the Department of Human Services' Child and Adult Care Licensing Unit. Kids First Childcare Agency opened in February 1998 and was located at 6700 Central Avenue Pike.

The parties stipulated to the introduction of Troupe's medical records into evidence.[2] The parties also stipulated to the following: Dr. Darinka Mileusnic-Polchan, the Knox County Chief Medical Examiner and an expert in forensic pathology, performed an autopsy on Bradley on May 26, 2016. Bradley was a twenty-seven-year-old white male, and his cause of death was multiple blunt force injuries from a motor vehicle crash. Dr. William R. Oliver, the Knox County Assistant Medical Examiner and an expert in forensic pathology, performed an autopsy on Troupe on May 29, 2016. Troupe was a forty-one-year-old African-American male, and his cause of death was multiple blunt force injuries from a motor vehicle crash. After the State read the stipulations to the jury, the State rested its case.

Alquianna Davidson testified that she was the Appellant's cousin and Troupe's niece. On May 25, 2016, Troupe telephoned Davidson and asked to borrow money. Davidson told Troupe to meet her at her house. Davidson and the Appellant arrived at Davidson's home and followed her to the bank. Davidson withdrew the money and motioned for them to follow her "down the road" to get gasoline. When the three of them got to the gas station, Davidson "gave them the money." Davidson told the Appellant and Troupe that she loved them, and that was the last time she saw them. She said Troupe needed the money for "part of child support or something like that." Upon being questioned by the trial court, Davidson testified that the Appellant and Troupe were in a maroon Impala. She said that she had seen the Impala previously, that the Appellant drove the car, and that "that was his car."

At the conclusion of the proof, the jury convicted the Appellant of driving on a suspended license, a Class B misdemeanor, in count one; evading arrest by Deputy Bannach and Officer Wilson, a Class D felony, in counts two and three, respectively; reckless homicide, a Class D felony, as a lesser-included offense of second degree murder in counts four and five; vehicular homicide, a Class C felony, in counts six and seven; reckless aggravated assault, a Class D felony, as a lesser-included offense of aggravated assault in count eight; possession of more than one-half gram of cocaine within one thousand feet of a private secondary school with intent to sell and deliver, a Class A felony, in counts nine and ten; possession of more than one-half gram of cocaine within one thousand feet of a daycare with intent to sell and deliver, a Class B felony, in counts eleven and twelve; possession of a controlled substance analog, a Class A misdemeanor, in count thirteen; and possession of marijuana, a Class A misdemeanor, in count fourteen. After a sentencing hearing, the trial court sentenced the Appellant as a Range II, multiple offender to an effective forty-eight-year sentence in confinement.

---

[2] The records show that Troupe died on May 28, 2016.

- 12 -

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his convictions of possession of more than one-half gram of cocaine with intent to sell and deliver within one thousand feet of a school, reckless homicide, vehicular homicide, and reckless aggravated assault. When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

### 1. Possession of Cocaine with Intent to Sell and Deliver

First, the Appellant claims that the evidence is insufficient to support his four convictions of possession of more than one-half gram of cocaine with intent to sell and deliver within one thousand feet of a school because the amount of cocaine at issue was more consistent with personal use. He also challenges the enhanced sentences for his convictions, claiming that he never intended to sell and deliver drugs in a school zone and

that he was only in the school zones just prior to the crash because he was evading arrest. The State argues that the evidence is sufficient. We agree with the State.

It is an offense for a defendant knowingly to sell or deliver a controlled substance. Tenn. Code Ann. § 39-17-417(a)(2), (3). Cocaine is a Schedule II controlled substance. Tenn. Code Ann. § 39-17-408(b)(4). Ordinarily, possession of one-half gram or more of cocaine with intent to sell or deliver is a Class B felony. Tenn. Code Ann. § 39-17-417(c)(1). However, at the time the Appellant committed the offenses and was sentenced for the convictions, the Drug-Free School Zone Act provided that selling or delivering a Schedule II controlled substance within one thousand feet of a "public or private elementary school, middle school, [or] secondary school" was punished one classification higher. See Tenn. Code Ann. § 39-17-432(b)(1) (2010). If the offense occurred within the prohibited zone of a childcare center, the offender was subject to an increased fine but not to an increased classification of offense. See Tenn. Code Ann. § 39-17-432(b)(3).

In support of his claim that the amount of cocaine at issue was more consistent with personal use, the Appellant refers to Officer White's testimony that cocaine weighing twenty-eight grams usually was for sale or delivery. The Appellant notes that the cocaine in this case weighed much less, only 3.68 grams. However, as noted by the Appellant "'[o]ther relevant facts'" may give rise to an inference that a defendant intended to sell and deliver. State v. Ziberia Carero, No. E2018-00684-CCA-R3-CD, 2020 WL 550205, at *9 (Tenn. Crim. App. at Knoxville, Feb. 3, 2020), perm. app. denied, (Tenn. July 17, 2020). Those other relevant facts include the absence of drug paraphernalia, the presence of a large amount of cash, the manner of packaging of the drugs, and the street value of the drugs. Id. (citing State v. Belew, 348 S.W.3d 186, 191 (Tenn. Crim. App. 2005)).

Here, Officer Wilson testified that he found a baggie containing cocaine in the "arm" of the driver's door, and the EMT who transported the Appellant to the hospital testified that he found a corner bag containing a rock-like substance in the ambulance. Agent Norman testified that she received several items for testing in this case. One of the items contained a single off-white, rock-like substance and five additional baggies that each contained an off-white, rock-like substance. Agent Norman analyzed the single rock-like substance and the substance in one of the baggies, and the substances were cocaine base. Officer White testified that crack cocaine for sale or delivery usually was packaged in several bags. Moreover, the police found $545 in the Appellant's pocket. The Appellant posits that based on Alquianna Davidson's testimony, the money was for the payment of child support. However, Davidson said that she withdrew the money from the bank and that the money was for Troupe's payment of child support. The money in this case was "in small bills" and was found on the Appellant's person, not Troupe's person. Finally, no drug paraphernalia was in the car, and the Appellant's blood was negative for drugs.

- 14 -

Therefore, a reasonable jury could conclude that the Appellant possessed the cocaine for sale and delivery.

As to the Appellant's claim that he did not intend to sell and deliver drugs within one thousand feet of a school and that he was only in the school zones because he was evading arrest, our supreme court has specifically rejected the argument that "simply traveling through a school zone is not enough to apply the provisions of the Drug-Free School Zone Act." State v. Vasques, 221 S.W.3d 514, 523 (Tenn. 2007). Accordingly, the Appellant's argument that simply traveling through a school zone while evading arrest is not enough to apply the provisions of the Drug-Free School Zone Act also must fail. See State v. Cantrell Lashone Winters, No. M2009-01164-CCA-R3-CD, 2011 WL 1085101, at *6 (Tenn. Crim. App. at Nashville, Mar. 24, 2011) (stating that the evidence was sufficient to show that the defendant traveled within two school zones as he fled from police). Additionally, this court has held that the version of the Drug-Free School Zone Act under which the Appellant was convicted did not require the State to prove that a defendant knowingly possessed the cocaine with intent to sell within one thousand feet of a school. State v. Taboris Jones, No. M2015-02515-CCA-R3-CD, 2017 WL 2493684, at *7 (Tenn. Crim. App. at Nashville, June 9, 2017). Therefore, the evidence is sufficient to support the Appellant's convictions and the enhanced punishment for his convictions.

2. Vehicular Homicide, Reckless Homicide, and Reckless Aggravated Assault

Next, the Appellant claims that the evidence is insufficient to support his convictions of vehicular homicide, reckless homicide, and reckless aggravated assault because his actions were not the proximate cause of Bradley's and Troupe's deaths or Kennedy's injuries. Specifically, the Appellant asserts that he attempted to avoid the collision by steering the Impala to the left and that the victims were not wearing seatbelts at the time of the crash. Again, the State argues that the evidence is sufficient. We agree with the State.

As charged in this case, vehicular homicide is the "reckless killing of another by the operation of an automobile . . . as the proximate result of . . . [c]onduct creating a substantial risk of death or serious bodily injury to a person." Tenn. Code Ann. § 39-13-213(a)(1). Reckless homicide is "a reckless killing of another." Tenn. Code Ann. § 39-13-215(a). Relevant to this case, reckless aggravated assault occurs when a person "recklessly causes bodily injury to another," and the assault "[i]nvolved the use or display of a deadly weapon." Tenn. Code Ann. §§ 39-13-101(a)(1), -102(a)(1)(B)(iii). A motor vehicle can constitute a deadly weapon. State v. Tate, 912 S.W.2d 785, 787 (Tenn. Crim. App. 1995). "Reckless" means that

a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. §§ 39-11-106(a)(33), -302(c).

As noted by the State, causation is an essential element of every homicide offense. State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001). As our supreme court has explained, the proximate cause of a victim's death "is generally established in Tennessee by showing that the victim's death was the natural and probable result of the defendant's unlawful conduct. The defendant's unlawful act or omission need not be the sole or immediate cause of the victim's death." Id. at 203 (citations omitted). "[A] victim's contributory negligence is not a complete defense but may be considered in determining whether or not the defendant's conduct was a proximate cause of death." Id. at 204. A jury's determination of causation is reviewed by this court under "the familiar sufficiency of the evidence standard." Id.

Taken in the light most favorable to the State, the evidence shows that Deputy Forsythe began following the Appellant on Edgemoore Road in Anderson County and that the Appellant accelerated and began passing cars on the two-lane road even before Deputy Forsyth tried to initiate a traffic stop. The Appellant proceeded through the intersection of Edgmoor and Clinton Highway, traveled onto Raccoon Valley Road and into Knox County, and headed south on Heiskell Road. At that point, the Anderson County officers terminated the pursuit. Officer Wilson of the KCSO heard that the Appellant could be in Knox County. Officer Wilson activated his emergency equipment and drove to Heiskell Road. As Officer Wilson was traveling north on Heiskell, he encountered the Appellant traveling south. The Appellant moved the Impala into Officer Wilson's northbound lane to avoid traffic stopped in the southbound lane and almost hit Officer Wilson "head on." The Appellant then traveled through the red light at Heiskell and Emory Road and proceeded south on Central Avenue Pike. As the Appellant approached the traffic light at Central Avenue Pike and Callahan Road, the light for the Appellant turned red, and the light for Bradley turned green. The Appellant, with the Impala's accelerator "floorboarded," went through the red light. As a result, Bradley's truck hit the front of the Impala's passenger side, and both vehicles ended up against a utility pole. The impact threw Bradley from the truck, killing him. Troupe died three days later from his injuries, and Kennedy suffered a broken tooth and scratches.

During closing arguments, defense counsel did not argue that the victims were not wearing seatbelts and that their failure to do so contributed to their deaths.[3] However, defense counsel argued that the Appellant swerved to avoid the truck. Defense counsel also repeatedly argued that the Appellant acted recklessly, not knowingly. The jury obviously agreed with that argument, choosing to convict the Appellant of reckless homicide as a lesser-included offense of second degree murder, which is a knowing killing of another pursuant to Tennessee Code Annotated section 39-13-210(a)(1); vehicular homicide as charged in the indictment; and reckless aggravated assault as a lesser-included offense of aggravated assault. The evidence is more than sufficient to support those convictions.

### B. Chain of Custody

The Appellant claims that the trial court erred by admitting the cocaine into evidence because there was a "break" in the chain of custody. The State argues that the Appellant has waived this argument and that he is not entitled to plain error relief. We agree with the State.

Prior to jury selection, defense counsel advised the trial court that there had been a "breach" in the chain of custody for the cocaine because Officer Wilson lost control of the cocaine that was on the hood of the Impala for "at least 30 minutes." The trial court responded that "[t]he State has to prove an appropriate chain of custody for any evidence it wishes to introduce. . . . If they can't prove it, it's not coming in."

During Officer Wilson's testimony, he stated that he put a baggie of cocaine and a baggie of marijuana that he removed from the Impala onto the hood of the car. At some point, he noticed that the baggies were not there and told two people "to go find out who had collected them." He acknowledged that he did not know the whereabouts of the baggies for about twenty minutes. Officer White later told Officer Wilson that he had collected the baggies and put them into his pocket. Officer White gave the baggies back to Officer Wilson.

Officer White testified that while he was assisting KCSO officers at the scene, Officer Wilson "threw" two bags of narcotics to him and that the bags landed on the hood of the Impala. Officer Wilson said he moved the bags "closer to the windshield to make sure they stay[ed] there and [were] secured." He then put on gloves, put the bags into a separate glove, and put the glove into his back pocket "just to secure that." Officer White

---

[3] No witnesses testified as to whether any of the occupants of the Impala or the truck were wearing seatbelts. However, it appears from Officer Wilson's body camera video that the Appellant and Troupe were not wearing seatbelts.

later gave the drugs back to Officer Wilson. Officer White said the drugs did not leave his back pocket until he returned them to Officer Wilson. On cross-examination, defense counsel asked Officer White if Officer Wilson told him to take possession of the drugs. Officer White said no but that Officer Wilson threw the bags in his direction and that he "assumed" Officer Wilson wanted him to secure the evidence.

Generally, Tennessee Rule of Evidence 901 governs the authentication of evidence. In order to admit physical evidence, the party offering the evidence must either introduce a witness who is able to identify the evidence or establish an unbroken chain of custody. State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998). "Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering." State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008). However, the circumstances must establish a reasonable assurance of the identity of the evidence. State v. Kilburn, 782 S.W.2d 199, 203 (Tenn. Crim. App. 1989). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). Usually, whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. Holbrooks, 983 S.W.2d at 701.

Initially, we note that the State claims the Appellant has waived this issue because he failed to make a contemporaneous objection to the admissibility of the evidence. We agree with the State. Although defense counsel questioned the chain of custody for the cocaine before trial, defense counsel did not formally object to the admissibility of the evidence at that time. Moreover, when the State moved to introduce the cocaine into evidence during Officer Wilson's testimony, defense counsel did not object, so the trial court never ruled on the chain of custody. Generally, the failure to object to the chain of custody at trial waives the issue. State v. Darrell Wayne Bumpas, No. M2017-00746-CCA-R3-CD, 2017 WL 2493684, at *6 (Tenn. Crim. App. at Nashville, Feb. 12, 2018) (citing State v. Gilley, 297 S.W.3d 739 (Tenn. Crim. App. 2008)), perm. app. denied, (Tenn. Apr. 16, 2020); State v. Gregory Charles Dixon, No. M2016-00620-CCA-R3-CD, 2016 WL 6247430, at *6 (Tenn. Crim. App. at Nashville, Oct. 26, 2016) (citing Tenn. R. App. P. 36(a) and Tenn. R. Evid. 103(a)(1)).

In any event, we conclude that there was never a "break" in the chain of custody. Officer Wilson testified that he found a baggie of marijuana and a baggie of cocaine in the Impala and that he put the baggies onto the hood of the car. Officer White testified that

Officer Wilson threw the baggies to him. Officer White said he picked up the baggies, wrapped them in a glove, and put them into his back pocket to secure the evidence. He said the baggies never left his back pocket, and Officer White and Officer Wilson both testified that Officer White returned the baggies to Officer Wilson. The State showed Officer Wilson a baggie containing a green leafy substance and a baggie containing a white substance, and he identified them as the baggies he took out of the Impala. Therefore, we find no error regarding the chain of custody, let alone plain error. See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (providing that all five Adkisson factors, including that an unequivocal rule of law was breached, must be satisfied in order to grant plain error relief).

### C. Excessive Sentence

The Appellant contends that his effective forty-eight-year sentence is excessive because the trial court erred by sentencing him to the maximum punishments in the range for evading arrest, vehicular homicide, and reckless aggravated assault and erred by ordering consecutive sentencing. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, Tasha Harris testified for the Appellant that she worked in community relations for the City of Knoxville and that she co-managed the Save Our Sons Initiative. Harris said that her oldest son grew up with the Appellant, that her son and the Appellant went to school together, and that Harris knew the Appellant's parents. The Appellant spent a lot of time at Harris's home, and Harris thought he was "a bright kid" and "had a lot of joy." The Appellant played football with Harris's son in middle and high school, and Harris described the Appellant as joking, laughing, and playful. She said, though, that he was "always looking for love and acceptance" due to "the circumstances of his family" and that she did not think he would ever recover from Troupe's death. Harris stated that the Appellant should "serve some time" but asked that he have the opportunity to "turn himself around."

On cross-examination, Harris testified that after her son and the Appellant graduated from high school, they remained friends but did not see each other often. She said her personal experience with the Appellant was based on "when he was younger."

Norman Jefferson testified that he had been a pastor for thirty years and that he was the Appellant's friend. The Appellant knew Jefferson's grandson because they played basketball together in middle school. They later played football together, and the Appellant spent time with Jefferson's grandson at Jefferson's home. Jefferson said that the Appellant was in his presence often and that the Appellant "loved his sports and he loved people and we were a family." The Appellant was never involved in any type of violence and was

never aggressive, and Jefferson never saw him with a weapon. After graduation, Jefferson "lost track" of the Appellant. However, when he would see the Appellant, he would ask how the Appellant was doing, and the Appellant would always say, "I'm doing okay." Jefferson said that the Appellant "still [had] that smile on [his] face" and that Jefferson was "[v]ery much surprised" about the Appellant's actions in this case.

Ashley Osborne testified that she worked for a bank in Atlanta, that she and the Appellant grew up together, and that they had "a relationship" from 2009 to 2014 or 2015. She described the Appellant as "a protector" and "a people person" and said that he "always wanted to make sure that everyone around him was in good spirits. They were taken care of." Osborne never saw the Appellant involved in a fight and never knew him to carry a weapon. The Appellant had children and tried "to make sure that they were taken care of." The Appellant never had any money in his pocket, and Osborne always thought he was "broke" because she paid for everything. Osborne said that she understood two lives were lost due to the Appellant's actions but that the Appellant "saved [her] life" when she was a victim of bullying.

On cross-examination, Osborne acknowledged that the Appellant was a "fugitive from justice" from May 2015 to May 25, 2016. She said that she was not in contact with him during that time but that "bounty hunters" were looking for the Appellant and were contacting her. She said that the Appellant worked for a moving company in 2013 or 2014 but that she did not know how he earned a living from 2014 to May 25, 2016.

Clarissa Davidson, Troupe's sister and the Appellant's cousin, testified that she had known the Appellant since he was a baby. Davidson read a letter that she wrote on behalf of her family to the trial court. In the letter, Davidson asked for leniency for the Appellant. She described him as loving, caring, and sharing and said that he wanted to help people. The Appellant "had a smile that could light up the room" and always wanted to be around his children and family. The Appellant "tried to avoid trouble," and Troupe tried to act like a "big brother" and mentor to the Appellant. Davidson said that Troupe would not want anything to happen to the Appellant and that Troupe tried to encourage the Appellant "about doing the right and wrong things." She said that the Appellant had expressed sincere remorse for the deaths of Troupe and Bradley and that the Appellant was not fully aware of his actions on the day of the crash due to the severity of his own injuries. She said the Appellant was not affiliated with any gangs and "didn't like trouble." Davidson asked that Bradley's family forgive the Appellant.

The State read a victim impact statement from Jessica Bell, Bradley's fiancé. In the statement, Bell said that she lost the love of her life and that she thought about Bradley every day. She stated that "big life events," such as engagements and births, for their friends were "bittersweet" because Bradley was not there to share their happiness and that

she cried when Bradley's niece was born. She described Bradley as a "hard worker" and an "amazing man." She said that his death had impacted many people and that his death was "completely avoidable."

Derek Bradley, Kevin Bradley's brother, testified that Kevin was a "hard worker" and that his death left their father "empty." Derek's and Kevin's mother died in November 2015, and Derek, Kevin, and their older brother planned her funeral. Their brother lived in Florida, so Derek and Kevin worked as a "team" to take care of their grandfather, who had Alzheimer's. A baby was born to Derek and his girlfriend a few days before the sentencing hearing, and Derek gave his baby girl the middle name "James," which was Kevin's middle name. Derek said that he would not get to spend another day with Kevin and that Kevin's family and friends still celebrated Kevin's birthday at Red Lobster every January. Derek stated that he forgave the Appellant and felt "bad" for the Appellant's and Troupe's families but asked that the trial court consider his family's loss.

James Bradley testified that that he lived his life for his three sons and that Kevin's death was an "unimaginable loss." Kevin owned his own business and built a house. He was about to get married and start a family, and he was "happy and excited." James said that life without Kevin was "off balance" but that he forgave the Appellant.

The trial court gave the Appellant an opportunity to make a statement. The Appellant said, "I would just like to apologize to his family and everybody that's involved in what I caused."

The State introduced the Appellant's presentence report into evidence. According to the report, the then twenty-eight-year-old Appellant was single with four young children. The Appellant graduated from Oak Ridge High School in 2009 and enrolled in Pellissippi State but never attended. In the report, the Appellant described his physical and mental health as "poor" due to post-traumatic stress disorder, issues with his hip and shoulder, a heart condition, a lung condition, brain damage, and memory loss. He stated that he had been declared disabled by a Knox County judge and that he was going to receive disability payments. The Appellant said in the report that he began drinking alcohol when he was twenty years old and that he consumed a couple of drinks per week. The Appellant stated that he began using marijuana when he was eighteen years old, Ecstasy when he was twenty-one years old, and cocaine when he was twenty-three years old and that he used marijuana daily and Ecstasy and cocaine weekly. The Appellant stopped using alcohol and drugs in 2016. The Appellant reported being employed by Access Staffing and by Sanford and Sons but could not provide any dates of employment.

According to the report, the Appellant was confirmed to be affiliated with the Bloods gang. The report showed that the Appellant had two prior felony convictions of

- 21 -

possession of cocaine, a prior felony conviction of evading arrest, and numerous prior misdemeanor convictions for traffic offenses, driving on a revoked license, driving without a license, failure to appear, possession of marijuana, and casual exchange.  The report also showed at least two violations of probation.

At the conclusion of the hearing, the trial court noted that as the Appellant approached the intersection of Callahan Road and Central Avenue Pike, the traffic light was red for the Appellant.  The trial court stated that the Appellant knew vehicles "were already pulling out" and that he made a conscious decision to "put [his] foot to the floor." The trial court said this case was "troubling" because Bradley had never met the Appellant and "just happened to be in your way that day."  The trial court stated that the Appellant "never cared about the potential carnage in front of [him]" and that the Appellant only cared about the "blue lights" behind him.

The trial court found the following enhancement factors applicable to the Appellant's sentences:  (1), that "[t]he defendant had a previous history of criminal convictions or behavior, in addition to those necessary to establish the appropriate range"; (8), that "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community"; (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high"; and (13), that the defendant was on community corrections when he committed the felony offenses. Tenn. Code Ann. § 40-35-114(1), (8), (10), (13).  In mitigation, the trial court applied factor (13), the catch-all provision, for the Appellant's being "someone that a lot of people love," noting that "the courtroom has been packed every single time that he's been in the court with people that support him."

The trial court found that the Appellant was a Range II, multiple offender.  The trial court sentenced him to six months for driving on a suspended license, a Class B misdemeanor, in count one; eight years for each conviction of evading arrest, a Class D felony, in counts two and three; four years for each conviction of reckless homicide, a Class D felony, in counts four and five; ten years for each conviction of vehicular homicide, a Class C felony, in counts six and seven; eight years for reckless aggravated assault, a Class D felony, in count eight; thirty years for each conviction of possession of more than one-half gram of cocaine within one thousand feet of a private secondary school with intent to sell and deliver, a Class A felony, in counts nine and ten; twelve years for each conviction of possession of more than one-half gram of cocaine within one thousand feet of a daycare with intent to sell and deliver, a Class B felony, in counts eleven and twelve; and eleven months, twenty-nine days for possession of a controlled substance analog and possession of marijuana, Class A misdemeanors, in counts thirteen and fourteen, respectively.  The trial court merged count four into count six; count five into count seven; and counts ten, eleven, and twelve into count nine.  The trial court ordered that the Appellant serve the

sentences for counts one, nine, thirteen, and fourteen concurrently for an effective sentence of thirty years; that he serve the sentences for counts six, seven, and eight concurrently for an effective sentence of ten years; and that he serve the sentences for counts two and three concurrently for an effective sentence of eight years.[4]

Regarding consecutive sentencing, the trial court found that the Appellant was an offender whose record of criminal activity was extensive and that he was a dangerous offender. See Tenn. Code Ann. § 40-35-115(b)(2), (4). The trial court ordered that the Appellant serve the effective ten-year sentence consecutive to the effective thirty-year sentence and that he serve the effective eight-year consecutive to the effective ten-year sentence for a total effective sentence of forty-eight years.

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; (8) the result of a validated risk and needs assessment; and (9) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

---

[4] The trial court noted that the Appellant was required to serve one hundred percent of the minimum punishment in the range, twenty-five years, for count nine. See Tenn. Code Ann. §§ 39-17-432(c); 40-35-112(b)(1).

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

The Appellant claims that the trial court erred by sentencing him to eight years, the maximum punishment in the range, for evading arrest in counts two and three; ten years, the maximum punishment in the range, for vehicular homicide in counts six and seven; and eight years, the maximum punishment in the range, for reckless aggravated assault in count eight. The Appellant contends that the trial court abused its discretion because the court appeared to increase his sentences to the maximum punishment in the ranges for the applicable enhancement factors but did not reduce his sentences for the applicable mitigating factor. The Appellant asserts that the mitigating factor warranted sentences below the maximum. However, the trial court found that four enhancement factors applied in this case, and the Appellant does not contest the applicability of those factors. The Appellant's sentences were within the ranges of punishment for a Range II offender and were presumptively reasonable. We agree with the State that the Appellant has not overcome the presumption.

Finally, the Appellant claims that trial court erred in ordering consecutive sentencing because he tried to avoid hitting Bradley's truck by steering to the left prior to the wreck, because his prior convictions did not involve violent offenses, and because he was a "likeable" person who never engaged in violent behavior or carried a weapon. The Appellant also claims that the circumstances of this case did not warrant an effective forty-eight-year sentence and that the sentence equates to a life sentence because he will not be eligible for release until he is sixty-two years old.

In addressing consecutive sentencing, the trial court found that the Appellant's criminal history was extensive, noting that he began committing crimes soon after he became an adult and that the record demonstrated he was "a drug dealer." The Appellant does not contest the court's finding that his criminal history was extensive. Instead, he asserts that his extensive criminal history did not include convictions for violent offenses. The trial court also found that the Appellant was a dangerous offender, stating that the court was "familiar with the Wilkerson factors" and that the sentence imposed "is necessary to protect the public from further conduct such as this" by the Appellant. See State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). Again, the Appellant does not contest the trial court's finding. Accordingly, we conclude that the trial court did not abuse its discretion by ordering consecutive sentencing.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE